2007 UT App 349

**STATE of Utah, Plaintiff and Appellee,**

v.

**Shayne E. TODD, Defendant and Appellant.**

**No. 20030157–CA.**

Court of Appeals of Utah.

Oct. 25, 2007.

Linda M. Jones, Salt Lake City, for Appellant.

Mark L. Shurtleff, atty. gen., and Kris C. Leonard, asst. atty. gen., Salt Lake City, for Appellee.

Before Judges BILLINGS, DAVIS, and ORME.

## OPINION

ORME, Judge:

¶ 1 On February 28, 1999, Stephanie Todd was shot and killed during an altercation with her estranged husband, defendant Shayne Todd. Defendant claimed the gun fired accidentally, while the State maintained the shooting was intentional. On appeal, Defendant asserts that the prosecutor made inappropriate statements during closing argument and that the trial court improperly denied Defendant's motion for a mistrial. We agree that the prosecutor's statements were improper and constituted prosecutorial misconduct. However, our confidence in the

verdict is not undermined, and we conclude Defendant was not prejudiced by the misconduct. Therefore, we affirm Defendant's conviction.

## BACKGROUND

¶ 2 Stephanie and Defendant were married but separated. In February 1999, Stephanie was living with her boyfriend, John Dinga. Following her separation from Defendant, Stephanie retained possession of a Chevrolet Blazer, which Defendant had purchased prior to the marriage, on the conditions that Dinga would not drive it and that she would properly care for it.

¶ 3 On February 28, 1999, Defendant drove by Stephanie's residence. He saw the Blazer parked in front and decided to take it using a key he had retained. Defendant was apparently unhappy with the way Stephanie was caring for the car and claimed to have seen Dinga driving it. Defendant took the Blazer, which contained some of Stephanie's personal property, including her purse. The purse contained $1300 in cash she had recently borrowed. When Stephanie noticed the Blazer was missing, she immediately suspected Defendant and called the police. The police informed her that because she was still married to Defendant and Defendant's name was on the Blazer's title, they regarded it as a civil matter.

¶ 4 Later that day, Stephanie and Defendant spoke by phone and arranged to meet in person at a parking lot in Sandy. At this meeting, Stephanie understood that Defendant would return the Blazer and her purse containing the $1300. Defendant decided to bring a Glock 10–millimeter pistol to the meeting.

¶ 5 That evening, Stephanie and her brother drove to the agreed destination. They pulled up next to the Blazer, and Defendant handed the purse to Stephanie's brother. Stephanie then exited the car, approached the driver's door of the Blazer, and started arguing with Defendant. Defendant began to drive away, and Stephanie reached into the window and hung onto the door. Despite Stephanie hanging onto the Blazer, Defendant continued to drive through the parking lot at a speed somewhere between 15 and 35 miles per hour. Stephanie's brother realized what was happening, made a U-turn, and followed the Blazer. Suddenly, Stephanie's brother "heard a popping noise," and Stephanie fell from the Blazer. Defendant continued driving and exited the parking lot. Stephanie had been shot in the head and was pronounced dead at the scene.

¶ 6 One day later, Defendant was apprehended at a relative's house. Defendant was charged with murder, among other crimes. The other charges were resolved via plea bargain, and Defendant proceeded to trial on the murder charge. After a nine-day jury trial, Defendant was convicted of murder.

¶ 7 At trial, Defendant testified that he brought the gun to the parking lot because he was afraid of Dinga. He also testified that his gun, loaded and ready to be fired, was in his lap as he waited in the Blazer for Stephanie to arrive. Further, he testified that after Stephanie jumped onto the Blazer, she grabbed the gun, they struggled, and the gun accidentally fired.

¶ 8 During closing argument, the prosecutor made several impassioned references to what Stephanie "might have told you" if she had been alive to testify. The prosecutor also discussed Defendant's reckless drive through the parking lot in arguing that Defendant intended to cause serious bodily injury to Stephanie and, in so doing, caused her death. Defendant did not object to these statements until after the prosecutor had completed her closing argument to the jury.

¶ 9 During his closing argument, Defendant's counsel told the jurors they should not be guided by their passions and sympathies, but should consider only the evidence. Further, he repeatedly reminded the jurors that they could only view the gun as the cause of death and that any consideration of the drive through the parking lot as a cause of Stephanie's death was inappropriate.

¶ 10 After closing arguments, Defendant's counsel moved for a mistrial. The trial court denied the motion, but indicated it would provide a curative instruction regarding the prosecutor's statements. Defendant's counsel then thanked the court. Before the jurors

retired to deliberate, the court provided the curative instruction, admonishing the jurors that the attorneys were not testifying during closing arguments and that the jurors could only consider the evidence before them.

¶ 11 At the end of the trial, the court specifically asked Defendant's counsel if he had any further objections for the record, to which he responded he did not. At no point did he register an objection to the substance or strength of the curative instruction.

¶ 12 At a sentencing hearing on March 14, 2001, the trial court orally announced Defendant's sentence. About a week later, Defendant filed a motion for a new trial. The court entered its written sentencing order on March 28, 2001. Nearly two years later, on January 23, 2003, the trial court denied Defendant's motion for a new trial.

¶ 13 Defendant filed a notice of appeal to the Utah Supreme Court on February 21, 2003. The case was transferred to this court, *see* Utah Code Ann. § 78–2–2(4) (2002), and we dismissed for lack of jurisdiction, holding that Defendant's motion for a new trial had not been timely filed. *See State v. Todd,* 2004 UT App 266, ¶ 22, 98 P.3d 46. The Supreme Court granted certiorari, *see State v. Todd,* 109 P.3d 804 (Utah 2005); reversed our jurisdictional determination; and remanded the matter for our consideration of the merits of Defendant's appeal. *See State v. Todd,* 2006 UT 7, ¶¶ 6–9, 128 P.3d 1199.

## ISSUE AND STANDARD OF REVIEW

¶ 14 Only one issue is now before us: Whether the trial court erred in failing to grant Defendant's motion for a new trial based on statements the prosecutor made during closing argument. On a motion for a new trial, the initial determination of whether improper remarks have influenced a verdict is within the discretion of the trial court. *See State v. Valdez,* 30 Utah 2d 54, 513 P.2d 422, 426 (1973).

> In determining whether a given statement constitutes prosecutorial misconduct, the statement must be viewed in light of the totality of the evidence presented at trial. Further, because the trial court is in the best position to determine the impact of a

statement upon the proceedings, its rulings on whether the prosecutor's conduct merits a mistrial will not be overturned absent an abuse of discretion.

*State v. Cummins,* 839 P.2d 848, 852 (Utah Ct.App.1992) (citing *State v. Gardner,* 789 P.2d 273, 287 (Utah 1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 965 (1990)), *cert. denied,* 853 P.2d 897 (Utah 1993).

## ANALYSIS

¶ 15 "Generally speaking, in argument to the jury, counsel for each side has considerable latitude and may discuss fully from their viewpoints the evidence and the inferences and deductions arising therefrom." *State v. Tillman,* 750 P.2d 546, 560 (Utah 1987) (citation omitted).

> A prosecutor's actions and remarks constitute misconduct that merits reversal if the actions or remarks call to the attention of the jurors matters they would not be justified in considering in determining their verdict and, under the circumstances of the particular case, the error is substantial and prejudicial such that there is a reasonable likelihood that in its absence, there would have been a more favorable result for the defendant.

*Id.* at 555. *See State v. Colwell,* 2000 UT 8, ¶ 39, 994 P.2d 177; *State v. Troy,* 688 P.2d 483, 486 (Utah 1984); *State v. Basta,* 966 P.2d 260, 268 (Utah Ct.App.1998); *State v. Cummins,* 839 P.2d 848, 852 (Utah Ct.App. 1992). Thus, prosecutorial misconduct claims trigger "a two-step test that must be applied 'under the circumstances of the particular case.'" *Troy,* 688 P.2d at 486 (quoting *State v. Valdez,* 30 Utah 2d 54, 513 P.2d 422 (1973)).

¶ 16 We first analyze whether the prosecutor's statements during closing argument called the jurors' attention to matters they were not authorized to consider during deliberations. Next, we analyze whether "the error is substantial and prejudicial such that there is a reasonable likelihood that in its absence, there would have been a more favorable result for the defendant." *Tillman,* 750 P.2d at 555.

I. Improper Statements

¶ 17 In our judicial system, "the prosecution's responsibility is that of 'a minister of justice and not simply that of an advocate,' which includes a duty 'to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence.'" *State v. Hay*, 859 P.2d 1, 7 (Utah 1993) (quoting Utah R. Prof'l Conduct 3.8 & cmt. 1) (footnotes omitted). Thus, "the conduct of the prosecutor at closing argument is [appropriately] circumscribed by the concern for the right of a defendant to a fair and impartial trial." *Commonwealth v. Cherry*, 474 Pa. 295, 378 A.2d 800, 803 (1977). *See State v. Troy*, 688 P.2d 483, 486 (Utah 1984) (discussing "whether [the prosecutor's] misconduct deprived defendant of a fair trial"). Prosecutors are held to a high standard regarding their conduct, given "the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding facilities presumably available to the office." ABA Standards for Criminal Justice: Prosecution Function and Defense Function 3–5.8 cmt. (1993). *See also Cherry*, 378 A.2d at 804 (quoting ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function 5.8 (Approved Draft 1971)).

¶ 18 Thus, while prosecutors must have the freedom to present closing argument with logical force, they must also act within the constraints imposed upon their office. *See* Utah R. Prof'l Conduct 3.8 & cmt. 1. Accordingly, "[t]he prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence." ABA Standards for Criminal Justice: Prosecution Function and Defense Function 3–5.8(d) (1993). When a prosecutor's conduct exceeds the bounds of permissible argument and the defendant is thereby prejudiced, reversal is required. *See State v. Colwell*, 2000 UT 8, ¶ 39, 994 P.2d 177. As the United States Supreme Court observed, "while [the prosecutor] may strike hard blows, he is not at liberty to strike foul ones." *Berger v.*

*United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

A. Invoking the passions of the jury

¶ 19 In defining permissible conduct during closing argument, the American Bar Association states that "[t]he prosecutor should not make arguments calculated to appeal to the prejudices of the jury." ABA Standards for Criminal Justice: Prosecution Function and Defense Function 3–5.8(c) (1993). For example, a prosecutor is prohibited from asking jurors to put themselves in the victim's place. *See Cherry*, 378 A.2d at 804. Courts also discourage references to a deceased victim. *See, e.g., Williford v. State*, 142 Ga.App. 162, 235 S.E.2d 625, 626 (1977) (concluding that prosecutor's references to the victim as a married man who would never get to see his newborn child were improper). Of direct relevance to this case, it has been held that reference during closing argument to how a victim would have testified had he or she been alive to testify constitutes prosecutorial misconduct because it unfairly appeals to the sympathies of the jury. *See Commonwealth v. Lipscomb*, 455 Pa. 525, 317 A.2d 205, 206–07 (1974).

¶ 20 In *Lipscomb*, the prosecutor recounted a lengthy version of what the victim would have said if he had lived to testify. *See* 317 A.2d at 206. In addition to other inflammatory statements, the prosecutor referred to the victim as "my best witness" and suggested that the victim would have testified, "I didn't want to die. I was only 59 years of age. I think I had a number of years ahead of me, I didn't want to die." *Id.* (internal quotation marks omitted). The court held that such an argument "exceeded the bounds of propriety and constituted an appeal to the passions and prejudices of the jury. Moreover, in testifying as if his 'best witness' was in the courtroom, that which followed amounted to the giving of testimony by an unsworn witness." *Id.* at 207.

¶ 21 The prosecutor in this case made several impassioned references to what Stephanie "might have told [the jury]" had she been alive to testify. Such a strategy during closing argument is a highly risky and improper rhetorical device that should be scrupulously

avoided. In making such statements, counsel runs the risk that jurors will feel obligated to seek revenge for the victim. *See Cherry*, 378 A.2d at 805. These statements are therefore improper because "[t]he determination of guilt must *not* be the product of fear or vengeance but rather intellectually compelled after a disinterested, impartial and fair assessment of the testimony that has been presented." *Id.* at 803 (citation and internal quotation marks omitted) (alteration and emphasis in original). Thus, statements regarding what a deceased victim might have said call the jurors' attention to matters which they are not justified in considering when reaching their verdict and constitute prosecutorial misconduct.

### B. Referring to matters not in evidence

¶ 22 Rule 3.4(e) of the Utah Rules of Professional Conduct provides that a lawyer may not "allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence." Utah R. Prof'l Conduct 3.4(e). A prosecutor's "suggest[ion] to the jury that they consider and 'deliberate' matters outside the evidence" constitutes prosecutorial misconduct. *State v. Troy*, 688 P.2d 483, 486 (Utah 1984). *See State v. Hopkins*, 782 P.2d 475, 478 (Utah 1989) ("[C]ounsel is precluded from arguing matters not in evidence."); *State v. Palmer*, 860 P.2d 339, 344 (Utah Ct.App.) ("A comment by a prosecutor during closing argument that the jury consider matters outside the evidence is prosecutorial misconduct."), *cert. denied*, 868 P.2d 95 (Utah 1993).

¶ 23 In the instant case, the prosecutor made reference to matters that had not been admitted into evidence. More specifically, the prosecutor postulated what Stephanie would tell the jurors had she lived. The prosecutor stated:

And [Stephanie] would tell you that when the defendant pulled up and handed her brother Kelly an empty purse and wasn't ready to turn over the Blazer, that she got mad and she got out of the car and she went over to the defendant's window to let him know how mad she was. And you can understand how angry she must have been.

And she would tell you that when it became clear that the defendant was about to drive away, she wanted to stop him. He had her money, her $1300. How was [she] going to pay that back? And he had the Blazer, the only car that she had. And so she grabbed onto the Blazer to try to stop him.

¶ 24 These assertions were not in evidence and, in several respects, actually contradict the evidence of record. In fact, her brother's trial testimony established that Stephanie did not know the purse was empty when she got out of the car to confront Defendant. Rather, it was Stephanie's brother who searched the purse and discovered the money was missing *after* Stephanie had already exited the car. Further, since Stephanie did not yet know that the money was missing from the purse, her decision to grab onto the Blazer was apparently not motivated by the desire to retrieve her money, as the prosecutor claimed.

¶ 25 The prosecutor also stated:

And if Stephanie were here she would probably tell you that she regretted her decision to grab onto the Blazer as soon as she did it, because the defendant didn't stop, he kept going. And I think Stephanie would tell you that it was a pretty frightening ride.... And Stephanie would tell you that she held onto that vehicle with everything that she could, because she was afraid that if she let go she would have been dragged under the wheels and crushed by the car. Stephanie would tell you that she felt like if she let go of that Blazer she would be killed.

... I think Stephanie would tell you that she looked back hoping somebody was coming to help her. And that as she had her head turned away looking behind her, maybe she could see her brother, that she could feel the barrel of the gun pressed up against her head.

¶ 26 Obviously, it is impossible to know whether Stephanie immediately regretted the decision to grab onto the Blazer. And it is equally impossible to know whether or not Stephanie was afraid that if she let go of the

truck, she would be pulled underneath the wheels and killed. And while the record indeed reflects that Stephanie was looking toward the back of the Blazer when the gun fired, it is nevertheless impossible to know whether she was actually looking back for help.

¶ 27 According to the prosecutor's argument, Stephanie's decisions and reactions were completely typical, lucid, and rational, even though the medical examiner found intoxicating levels of methamphetamine in her system. While such complete lucidity under those circumstances is perhaps possible, it is at least equally plausible that Stephanie had neither the time nor the mental clarity to appreciate the increasing danger. In any event, "Stephanie's version" of the story, which predictably supported the State's theory of the case, was not in evidence, and it was improper for the prosecutor to lead the jury to believe they could consider such a hypothecation. Such statements improperly referred the jury to matters that they were not justified in considering and, as such, constituted prosecutorial misconduct.

### C. Misstatement of the law

■ ¶ 28 Defendant also contends that the prosecutor misstated the law regarding the elements of murder during closing arguments. When the prosecution misstates the law during closing argument, it necessarily calls the jurors' attention to matters that they are not justified in considering, thus satisfying the first prong of the prosecutorial misconduct test. *See State v. Longshaw*, 961 P.2d 925, 929 (Utah Ct.App.1998). *See also State v. Hovater*, 914 P.2d 37, 44–45 (Utah 1996) (suggesting that misstatement of the law constitutes prosecutorial misconduct unless error is cured); *State v. Haston*, 811 P.2d 929, 933 (Utah Ct.App.1991) (holding that statements made by prosecutor during closing argument, which the state conceded were misstatements of the law, satisfied the first prong of the prosecutorial misconduct test), *rev'd on other grounds*, 846 P.2d 1276 (Utah 1993).

¶ 29 During closing argument in this case, the prosecutor properly reminded the jurors that the jury instructions, namely Instruc-

tions 11 and 16, should provide guidance during their deliberations about Defendant's mental state at the time of the shooting. The prosecutor also correctly informed the jurors that in order to find Defendant guilty of murder under the relevant jury instructions, they had to find that Defendant had *caused* Stephanie's death in one of three ways. Specifically, Instruction 11 provided that to convict Defendant of murder, the jury had to determine if Defendant caused Stephanie's death

(a) intentionally or knowingly; or,

(b) intending to cause serious bodily injury to another, he committed an act clearly dangerous to human life, which act caused the death of Stephanie Todd; or,

(c) acting under circumstances evidencing a depraved indifference to human life, the defendant engaged in conduct which created a grave risk of death to another and which conduct caused the death of Stephanie Todd. . . .

■ ¶ 30 The prosecutor then guided the jurors through each of the three possible theories of murder. In so doing, she misstated how properly to apply the law to the facts under the second theory of murder. The prosecutor stated:

> Twenty miles per hour, thirty miles per hour, not quick speeds on the freeway, but in a parking lot when you're hanging onto the side of a lifted-up vehicle, [are] extremely fast speeds, extremely dangerous conduct. Trying to push someone off a moving car in a parking lot is an act that is intended to cause serious bodily injury.

There is no dispute that the cause of Stephanie's death was a gunshot wound to the head and that the fall from the vehicle in no way contributed to her death. Therefore, the prosecutor's remarks would tend to mislead the jury regarding the law applicable to the facts in evidence. While Defendant's acts in driving around the parking lot, with Stephanie hanging onto the Blazer, and his trying to push her from the Blazer were "clearly dangerous to human life," they did not "cause[ ] the death of Stephanie Todd." Thus, the prosecutor "call[ed] to the attention of the jury a matter it [was] not. . . . justified in

considering." *Longshaw,* 961 P.2d at 928 (citations and internal quotation marks omitted).

## II. Prejudice

¶ 31 We next address the second prong of the prosecutorial misconduct test: Whether "the error is substantial and prejudicial such that there is a reasonable likelihood that in its absence, there would have been a more favorable result for the defendant." *State v. Tillman,* 750 P.2d 546, 555 (Utah 1987). In undertaking this evaluation, we are mindful that "[a] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." *United States v. Diaz–Carreon,* 915 F.2d 951, 956 (5th Cir.1990) (citation and internal quotation marks omitted). Rather, "[i]mproper prosecutorial comments require reversal only if [they] substantially affected the defendant's right to a fair trial." *Id. See State v. Troy,* 688 P.2d 483, 486 (Utah 1984). Furthermore, "[f]or an error to require reversal, the likelihood of a different outcome must be sufficiently high to undermine confidence in the verdict." *State v. Knight,* 734 P.2d 913, 920 (Utah 1987).

¶ 32 Defendant asserts that absent any prosecutorial misconduct, there is a reasonable likelihood that the jurors would have found him guilty of the lesser offense of negligent or reckless homicide. Stated another way, Defendant asserts that the prosecutor's statements were so prejudicial as to undermine confidence in the verdict. We disagree. After careful evaluation of the factors enumerated by the Supreme Court in *State v. Dunn,* 850 P.2d 1201 (Utah 1993), we are unable to say that the prosecutor's statements, even though improper, substantially affected Defendant's right to a fair trial. We conclude there is not a reasonable likelihood that the outcome would have been any different, and thus our confidence in the verdict is not undermined. *See id.* at 1224–25.

¶ 33 The prejudice prong of prosecutorial misconduct analysis requires

> consideration of the circumstances of the case as a whole. In making such a consideration, it is appropriate to look at the evidence of defendant's guilt.

> "If proof of defendant's guilt is strong, the challenged conduct or remark will not be presumed prejudicial." Likewise, in a case with less compelling proof, this Court will more closely scrutinize the conduct. If the conclusion of the jurors is based on their weighing conflicting evidence or evidence susceptible of differing interpretations, there is a greater likelihood that they will be improperly influenced through remarks of counsel.

*Troy,* 688 P.2d at 486 (citation omitted).

¶ 34 In *Dunn,* the Utah Supreme Court announced two additional factors relevant to the determination of whether a defendant has been prejudiced by improper statements. *See* 850 P.2d at 1224–25. The first factor is whether defense counsel addressed the improper statements during closing argument and the prosecution then "restricted his surrebuttal comments to the evidence and made no further mention of" the improper comments. *Id.* at 1225. The second factor is whether the trial court gave a curative instruction admonishing the jury to "dispassionately consider and weigh the evidence" and instructing them "not to consider the statements of counsel as evidence." *Id.*

## A. Evidence of guilt

¶ 35 In determining whether a defendant has been prejudiced by prosecutorial misconduct, we consider the case as a whole, including evidence of Defendant's guilt. *See Troy,* 688 P.2d at 486. As just indicated, " '[i]f proof of defendant's guilt is strong, the challenged conduct or remark will not be presumed prejudicial.' " *Id.* (citation omitted). But "[w]hen the evidence in the record is circumstantial or sufficiently conflicting, jurors are more likely influenced by an improper argument. In such instances, they are more susceptible to the suggestion that factors other than the evidence before them should determine a defendant's guilt or innocence." *State v. Andreason,* 718 P.2d 400, 403 (Utah 1986). *See Troy,* 688 P.2d at 487 (noting that where evidence against defendant was not "compelling" and "[t]he jury could have found either way," there was in-

sufficient proof of defendant's guilt to outweigh prejudice of prosecutor's comments).

¶ 36 In this case, Defendant maintained that as Stephanie hung onto the side of the Blazer while it moved through the parking lot at perhaps 20 miles per hour, they struggled for the gun and it accidentally discharged. But the State presented ample direct evidence to show that there was little or no struggle over the gun and to support, instead, a theory of an intentional shooting. For example, Defendant testified that he had no difficulty driving in the parking lot; rather, he claimed that he "drove a perfect straight line." This is inconsistent with Defendant's contention that a struggle was occurring inside the vehicle. The State's firearms expert also testified that due to safety features of the Glock pistol, Defendant would have had to depress the trigger safety on the center of the trigger in order for the gun to fire.[1] This, too, is inconsistent with an accidental shooting during a struggle for mere control of the pistol.

¶ 37 Defendant's own forensic consultant testified that based on the location where the shell casing was found, the gun must have been outside of the Blazer when it fired, which suggests that no struggle occurred *inside* the car at the time the gun discharged. Importantly, a struggle would have been almost physically impossible with Stephanie's head outside the vehicle while she held onto the door with no place to rest her feet.[2] Finally, the most persuasive piece of evidence was the presence of a "hard contact" wound near Stephanie's left ear. The State Medical Examiner testified that the hard contact wound indicated the gun had to have been pressed firmly against the side of Stephanie's head when it was fired. This testimony is compelling direct evidence that the shooting was not accidental.

¶ 38 Defendant nonetheless maintains that the shooting was accidental. He argues that the hard contact wound was caused by the gun "accidentally" being pressed against Stephanie's head during the struggle. This is implausible. The State Medical Examiner testified that the presence of a hard contact wound was totally inconsistent with an accidental shooting. The Medical Examiner explained: "When people are fighting over a weapon they usually try to make sure that weapon isn't pointing right at them.... I have never seen a case where a person has taken a gun, jammed it up against their [own] head and then oops, it went off." Defendant nonetheless asserts that a palm print on the barrel of the gun supports his theory because it is evidence that Stephanie was holding onto the gun at the time of the discharge. However, that print was apparently never analyzed, so this is mere conjecture.[3]

¶ 39 Defendant claims that his numerous calls to the police, as well as those to Stephanie's family and friends, indicate his remorse and bolster his claim that the shooting was accidental. We disagree. Remorse can just as easily follow intentional wrongdoing, after even a brief opportunity for reflection. *Cf.* B. Douglas Robbins, *Resurrection from a Death Sentence: Why Capital Sentences Should Be Commuted upon the Occasion of an Authentic Ethical Transformation,* 149 U. Pa. L.Rev. 1115, 1178 (2001) ("Emotional epistemology teaches us ... that a wrongdoer's guilt and/or remorse may be indicative of his culpability[.]"); Bryan H. Ward, *Sentencing Without Remorse,* 38 Loy. U. Chi. L.J. 131, 132, 137 (2006) (arguing that remorse should not be a factor used in sentencing decisions because such determinations are too subjective, and questioning whether

1. According to the State's expert, the trigger safety "prevents movement from the trigger if the pistol were to be dropped or violently struck."

2. The forensics consultant testified that "the presence of the shell casing outside of the vehicle indicates that the gun was fired outside of the vehicle." But as there was no running board for Stephanie to stand on, she apparently would have had to have been hovering off the side of the car in order for the struggle to have occurred far enough outside of the vehicle to account for the location of the shell casing, given the "hard contact" wound she sustained to the head.

3. Defendant also makes much of an injury on Stephanie's hand, arguing that it is consistent with her hand being on the gun at the time that it fired. It appears from the record, however, that the injury was not conclusively proven to have resulted from the gun discharging.

the presence of remorse is even relevant in criminal sentencing).

¶ 40 On balance, we conclude that there was compelling evidence on which the jury could reasonably rely in concluding that Defendant intentionally shot Stephanie. However, evidence of guilt is not the only factor courts consider in determining prejudice. *See State v. Dunn,* 850 P.2d 1201, 1225 (Utah 1993); *State v. Troy,* 688 P.2d 483, 486 (Utah 1984). To be thorough, we turn to the additional two factors identified in *Dunn,* even though it is probably not necessary given the compelling evidence of Defendant's guilt.

### B. Defense counsel's ameliorative statements

¶ 41 After the prosecutor makes an improper remark during his initial closing argument, defense counsel can ameliorate the effects of the comment by discussing the impropriety with the jurors. *See Dunn,* 850 P.2d at 1225. The helpful effects of defense counsel's remarks are bolstered if the prosecutor then "restrict[s] his surrebuttal comments to the evidence and ma[kes] no further mention of" the improper comments. *Id.*

¶ 42 In this case, after the prosecutor's initial closing argument, Defendant's counsel responded by addressing the improper statements. Specifically, defense counsel twice reminded the jurors that they should not be guided by passion or sympathy. Defense counsel also reminded the jurors at least nine times throughout his closing argument that it was improper for them to consider the drive around the parking lot as the cause of Stephanie's death and then twice referred them to the jury instructions for guidance on this issue. And on rebuttal, the prosecutor re-

frained from any further improper argument on those points. Accordingly, we think that defense counsel's repeated reminders to the jurors, which went uncontradicted by the prosecutor, helped to ameliorate any harmful effects of the prosecutor's improper comments.

### C. Curative admonition

¶ 43 "[C]urative instructions are a settled and necessary feature of our judicial process and one of the most important tools by which a court may remedy errors at trial." *State v. Harmon,* 956 P.2d 262, 271 (Utah 1998). Indeed,

> [i]f a trial judge could not correct errors as they occur, few trials would be successfully concluded. Moreover, our judicial system greatly relies upon the jury's integrity to uphold the jury oath, including its promise to follow *all* of the judge's instructions. . . . [V]irtually every jurisdiction, both state and federal, relies upon such instructions in curing errors during trial and in reviewing errors on appeal.

*Id.* at 272 (emphasis in original). Defendant argues the court's curative instructions were deficient for several reasons.

¶ 44 First, Defendant claims that the timing of the curative instruction had little or no impact because it had no temporal relationship to the prosecutor's improper statements. However, Defendant's objection did not come until the prosecutor was entirely finished with her closing argument.[4] Had Defendant's counsel objected earlier, the curative instruction would have been more closely linked in time to the improper statements. Therefore, the delay in Defendant's objection directly caused the timing problem of which he now complains.[5]

---

4. Defendant's counsel noted that he did not want to object during the prosecutor's closing argument. While this may have been out of courtesy, it could also have been a strategic maneuver. Either way, defense counsel's silence during closing argument allowed additional improper statements to be made. Had Defendant's counsel objected as soon as he recognized what the prosecutor was doing, the harmful remarks would have been greatly curtailed and, presumably, more timely addressed.

5. The jury was excused while the trial court considered Defendant's objection. We note that it may have been appropriate for the trial court to respond immediately after the jury returned and before defense counsel presented closing argument. *Cf. State v. Lopez,* 789 P.2d 39, 45 (Utah Ct.App.1990) (noting that the court immediately corrected prosecutor's misstatement of the law in the presence of the jury). We are unsure why the trial court chose to wait until the end of the prosecutor's rebuttal to address the jurors. However, in light of the timing of Defendant's objection, as well as his counsel's amelio-

¶ 45 Second, Defendant argues that the curative instruction was ineffectual because even though the court "advised the jury that the attorneys were not testifying and they were not under oath, that did not convey to jurors that closing argument did not constitute evidence." Therefore, he claims, the trial court failed to convey to the jurors that "they could not consider statements in deliberations made by the prosecutor."

¶ 46 The court's remarks to the jury included the following, with our emphasis:

And I also remind you that what you've heard is closing argument from the attorneys. *They are not testifying. They are not under oath. They are arguing* what they interpret or remember the facts to be. You also have your own independent recollection of what the facts are and you'll have the group as a whole to remember what the facts are. *Decide the case on what you remember the facts to be.*

Contrary to Defendant's assertions, we conclude that the trial court's additional statements—specifically, that the jurors must reach their decision based on their own interpretation of the facts and that the attorneys were just arguing—adequately conveyed that closing argument was not evidence.

¶ 47 Third, Defendant asserts that the court's instructions were unavailing because they did not explicitly inform the jurors that the prosecutor had misrepresented the law or admonish the prosecutor for doing so. While it may have been appropriate for the trial court to more promptly correct the misrepresentation, *see State v. Lopez,* 789 P.2d 39, 45 (Utah Ct.App.1990), the court did have the occasion to address the misstatement of the law when the jury specifically inquired about the issue. During deliberations, the jury submitted the following written question to the court:

The defense in their closing argument indicated that the only act we were to consider was the shooting of the gun . . . (which was the actual action which led to Stephanie's death). [Defense counsel] . . . said we were not to consider the drive through the

rative remarks to the jury, we conclude that any lack of promptness by the trial court was not

parking lot with Stephanie hanging onto the Blazer as part of the act that led to her death; is this correct?

The trial court advised counsel:

My response to the jury was you can—the fact that she was hanging onto the Blazer was the factual testimony that was factual, but that in regards to their question, they had to look to the jury instructions for any answers.

¶ 48 In our view, this exchange is important for several reasons. First, when the jurors specifically inquired about the correct application of the law, the court referred them to the jury instructions for any answers, largely remedying any earlier failure to correct the prosecutor's misstatement of the law or to refer jurors to the instructions. Second, contrary to Defendant's contention that the question shows that jurors were confused regarding this issue, it actually appears that the jurors correctly understood the law and were simply looking for reassurance that they had it right. When read in context, we interpret the question, "[I]s this correct?," merely as a confirmatory one, with the jurors seeking reassurance from the court that they were correct in considering *only* the gun as the actual cause of Stephanie's death. Finally, the exchange demonstrates that the jury understood the gunshot was the actual cause of Stephanie's death, given the parenthetical notation in their note.

¶ 49 Alternatively, in response to Defendant's general argument that the curative instruction was lacking in both substance and strength, we note that Defendant waived any objection to the content and force of the curative instruction when he acquiesced in the court's ruling. In *Workman v. Henrie,* 71 Utah 400, 266 P. 1033 (1928), defense counsel objected to improper prosecutorial statements during closing argument and requested that the court give a curative instruction. *See* 266 P. at 1036. After providing the instruction, the court asked defense counsel "if there was anything else he wanted the court to tell the jury," *id.* at 1037, and

prejudicial.

defense counsel, while taking exception to the prosecutor's remarks, indicated he did not want the court to say anything further. *See id.* On appeal, the defendant claimed the court had "not sufficiently direct[ed] or admonish[ed] the jury" and that the curative instruction was not specific enough to address the damage because it generally referred to any statement made by counsel that "was not confined to the evidence" and not to the "particular statement" in issue. *Id.* at 1036. The Utah Supreme Court held that the defendant had waived any right to complain about the substance of the instruction on appeal when he failed to indicate at trial what more should have been done.[6] *See id.* at 1037. Specifically, the Court said:

> After [the trial court] had given the direction, covering, as [it] thought, the substance of the request ... and the court asking him if there was anything else he wanted the court to tell the jury, counsel for the defendant declined to do so.... If counsel thought the direction which the court gave was not sufficiently specific, or did not fully cover the ground, he, in response to the court's inquiry, ought to have indicated the particular or particulars in which he thought the direction was lacking.

*Id.* at 1036–37.

¶ 50 In this case, Defendant had several opportunities to register any dissatisfaction with the court's curative instruction. Before giving the instruction, the court informed counsel of the intended substance of the instruction and even asked defense counsel to remind the court to give the instruction. At that point, Defendant's counsel said, "Thanks, your honor." Again, at the end of the trial, after the curative instruction had been given, the court asked Defendant if there was anything further he wanted on the record. Defendant's counsel indicated there was nothing else. Accordingly, when defense counsel thanked the court and replied that he had nothing further for the record, he waived any objection to the content and strength of the curative instruction.

## CONCLUSION

¶ 51 During closing argument, the prosecutor made remarks likely to inflame the passions of the jury, referred to matters outside the evidence, and misled the jury regarding how they could apply the law to the facts. This was improper and constituted prosecutorial misconduct. However, in light of the overwhelming evidence of Defendant's guilt, the ameliorative remarks of defense counsel, and the court's curative instruction, our confidence in the verdict is in no way undermined. Accordingly, we conclude that Defendant was not prejudiced.

¶ 52 Affirmed.

¶ 53 WE CONCUR: JUDITH M. BILLINGS, Judge, and JAMES Z. DAVIS, Judge.

6. Other jurisdictions have announced a similar rule. *See e.g., Bragg v. State,* 518 So.2d 847, 850 (Ala.Crim.App.1987) (holding that when defense counsel stated he was "satisfied" with the court's oral instructions to the jury, he was precluded from asserting the issue on appeal), *cert. denied,* 518 So.2d 847 (Ala.Crim.App.1988); *Walker v. State,* 428 So.2d 139, 142 (Ala.Crim.App.1982) (holding that when defense counsel indicated the curative instructions were sufficient, he waived any objection to the prosecutorial impropriety), *cert. denied,* 428 So.2d 139 (Ala.Crim.App.1983); *Carriage Hills Assocs. v. Municipal Elec. Auth.,* 264 Ga.App. 192, 590 S.E.2d 156, 159 (2003) (determining that where the trial court gave a curative instruction and counsel indicated no desire for further or more specific instructions, appellant acquiesced in the ruling and had no right to complain of it on appeal); *Rosenthal v. Hudson,* 183 Ga.App. 712, 360 S.E.2d 15, 17 (1987) (noting that a litigant cannot acquiesce in a ruling and then complain of the same on appeal); *People v. Pollick,* 448 Mich. 376, 531 N.W.2d 159, 164 (1995) (stating that failure to object to an instruction serves as a waiver of any error on appeal).