**2025 UT App 145**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DEVIN THOMAS,
Appellant.

Opinion
No. 20230704-CA
Filed October 9, 2025

Third District Court, West Jordan Department
The Honorable James D. Gardner
No. 221908267

Dain Smoland and Staci Visser,
Attorneys for Appellant

Derek E. Brown and Aubrey Bisbee,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

MORTENSEN, Judge:

¶1     Devin Thomas was charged with aggravated assault for strangling a woman who was staying at an apartment he was visiting. Asserting claims of ineffective assistance and plain error, he complains that the prosecutor improperly offered expert testimony in closing when describing photographs of the bruising the woman sustained from the attack. We reject these claims and affirm Thomas's conviction.

## BACKGROUND[1]

*The Crime*

¶2 Dorothy, who was alone at the time, was staying at the apartment of a friend (the occupant) when Thomas came by one afternoon.[2] Dorothy did not know Thomas, but according to her, receiving visitors was not uncommon because the occupant was a friendly guy who had many acquaintances. Thomas placed his backpack on a counter and then sat down next to Dorothy. Dorothy, who was about five months pregnant at the time, told Thomas that she was not feeling well as the two made small talk. She recalled that Thomas offered her "a couple of pills" that he said would make her feel better, but she didn't want to consume anything he gave her. It was at this point that Thomas's "demeanor kind of changed," and Dorothy began feeling uneasy around him, prompting her to look for her "stun gun." She said something about not being able to find it. Thomas then said, "Oh, I think it's right there," pointing to a spot near Dorothy. Dorothy turned her head to look where Thomas had pointed.

¶3 The next thing Dorothy remembered "was being choked by something" as Thomas stood in front of her. Dorothy said later that the item was "wrapped around [her] neck" and was "something like a shoelace or a couple of long things tied together in a way [she'd] never seen," like something she felt "a boy scout or something of that nature [would] do, special ties." As Thomas choked Dorothy, she fought back, flailing her arms, trying to hit

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (cleaned up).

2. We employ a pseudonym for the woman Thomas attacked.

him, and kicking while pleading with him to stop. But he continued to choke her, and she started seeing "white" and thinking that she was "going to pass out." She managed to get onto her hands and knees, but Thomas got on her back and continued strangling her. Dorothy later testified that the force of the strangulation was intense—describing it as "9 out of 10"—and consisted of "continuous pressure throughout." Suddenly, Thomas stopped the attack. Dorothy thought that "the thing he was choking [her] with had maybe broke." Thomas ran out of the apartment while Dorothy got up and tried to catch her breath. She attempted to run after him, but she began having painful abdominal cramps. Dorothy testified that she was uncertain how long the attack lasted: "It felt like [it was] a really long time. It could have been about two minutes. It felt like a long time. . . . [I]t could have been less. . . . I'm thinking about from when it started, from the beginning until the end [was] about a minute . . . ."

¶4 Dorothy called her mother, who arrived at the apartment within about fifteen minutes. Dorothy told her mother what had happened, and her mother encouraged her to call the police. But Dorothy was reluctant to do so because she "never . . . had a good relationship with cops." Her mother then looked through Thomas's backpack, which he had left behind when he fled. In it, she found prescription medication bearing Thomas's name. Dorothy's mother then used her phone to look up Thomas on social media and showed his picture to Dorothy. Dorothy confirmed that Thomas was the person who choked her.

¶5 About five days later, Dorothy's mother called the police to report the incident. Investigating officers took photographs of Dorothy's neck and obtained photographs that Dorothy's mother had taken on the day of the incident. When she met with police, Dorothy also identified Thomas from a photograph array as the person who attacked her.

¶6 Thomas was charged with one count of aggravated assault.

*The Proceedings*

¶7 At trial, the State presented the facts summarized above through testimony from Dorothy, her mother, and police officers. The State also introduced photographs of the marks on Dorothy's neck, some of which were taken by her mother and others of which were taken by police. A surveillance video showing Thomas fleeing from the apartment and into the hall was also introduced.

¶8 Thomas, who testified in his own defense, offered a different account of the events. He claimed that he went to the apartment to pick up some money and deliver it to another person. He said he met someone at the apartment, along with Dorothy, on the day in question. According to Thomas, this person went "to go grab something," leaving him alone with Dorothy. Thomas said that after about five or ten minutes, Dorothy pointed a gun at his "face and told [him] to get the heck out of there." He recalled, "I tried to grab my backpack. She told me no, you can leave your backpack right where it's at, get out of here. Don't walk, run. So I ran." Thomas said that he made his way to his cousin, who was waiting in a nearby vehicle. Thomas did not report this incident to the police or tell anybody else about it.

¶9 In closing, the prosecutor drew the jury's attention to the marks visible in the photographs of Dorothy's neck:

> This isn't some mysterious rash that appears in a line on her neck. Something put that line on her neck. The thing that put that line on her neck was that ligature, whatever it was, whether it was a rope or a cord or a string or a shoestring . . . .
>
> . . . Five days later, they're still visible. And, in fact, they're starting to get a little bit of definition where you can see, you can see the markings on here

that look like some sort of a cord or a string. And hopefully you can see that from there, but you're going to have copies of these and you can look at it more closely. But you can see that it was some sort of a cord or a rope or a string that made that mark.

. . . You can see the abrasions where it's really dark right here, but then there's a little bit of excess around there and you can see some striations there that appear to be from [a] sort of rope or cord.

¶10     The prosecutor then invited the jury to assess the evidence:

She's got the marks on her neck. Where did those come from? Did she strangle herself to make it look like this happened? That's what she would have had to do if she's just making this up.

And again, remember how much pressure there was. Remember those five day old shots where there's still marks on her neck. She would have had to have wrapped the cord around her neck, pull it tight, keeping in mind she's five months pregnant, and who knows what kind of effect this is going to have on her baby.

¶11     In his closing, Thomas's counsel (Counsel) stated that he found it "strange" that the marks on Dorothy's neck appeared in the photographs to be "jagged," offering the following analysis:

You take a rope or cord and you pull it tight around somebody's neck, my expectation is that there would be one smooth line around the neck . . . . If I take a cord and I get it super tight around somebody's neck, it should form one continuous mark around it that is pretty smooth.

Counsel then proposed that the marks on Dorothy's neck could have been there prior to the incident, perhaps from a suicide attempt. Counsel also discussed the mechanics of strangulation, focusing on the force and length of time Dorothy said accompanied the attack. He concluded that Dorothy's version of events was "impossible," arguing,

> You cannot strangle somebody with a rope at a pressure of 9 for two minutes or one-and-a-half minutes or one minute or 30 seconds without them going unconscious. That doesn't work.
>
> . . . .
>
> She says this rope around her neck, this was going on for about two minutes, maybe less. There's no way this is possible. And why would she say that? Because she didn't actually get strangled. Because if you don't know how long it usually takes to go unconscious, well, you just make up a number and that's what happened here.

¶12     Counsel then suggested that, instead of receiving the marks from an attack, Dorothy had perhaps made the marks herself by "rubbing" a rope "back and forth" around her neck. Counsel posited that Dorothy could use them to accuse Thomas of attacking her if he reported to the police that Dorothy threatened him with a gun: "[I]n this situation you have some marks and . . . if the marks weren't there, then it would really be her story against his story, and it is not that difficult to put some marks on your own neck and then blame [Thomas] in case he comes back."

¶13     In rebuttal, the prosecutor addressed Counsel's suggestion that Dorothy gave herself the marks by rubbing a rope on her neck:

[J]ust take a look at these [photographs]. It's very clear what made that mark. It is not this kind of movement. It is clearly pressure that left that mark. And you can see the marks and impressions that were left there by pressure. That's not the kind of a mark that's going to be left by making abrasions.

So the only way that this was made by [Dorothy] is if she strangled herself. That's the only way that mark gets there . . . . These marks are not rubbing marks. That's not what this looks like. These marks are there from pressure, pressure from the ligature.

¶14    The jury returned a guilty verdict.


ISSUES AND STANDARDS OF REVIEW

¶15    Thomas appeals, asserting that Counsel provided ineffective assistance in failing to object to the prosecutor's observations about the marks that appeared in the photographs of Dorothy's neck. Thomas next asserts that the trial court plainly erred in allowing these comments by the prosecutor to go unchecked. Claims for plain error and ineffective assistance of counsel present questions of law, which we determine in the first instance as a matter of law. *State v. Samora*, 2022 UT App 7, ¶ 16, 504 P.3d 195; *see also State v. Popp*, 2019 UT App 173, ¶ 19, 453 P.3d 657.


ANALYSIS

¶16    Thomas argues that the prosecutor's comments in closing about the photographs of Dorothy's neck amounted to prosecutorial misconduct. More specifically, he argues as follows:

> [The] prosecutor . . . veered into "expert testimony" during his closing argument, directing the jury to the photographs in the record and offering his personal (and unsupported) opinion that they "clearly" showed pressure marks from a "ligature," and were inconsistent with abrasions that the defense had suggested could have been self-inflicted. Those statements were inappropriate, and both the trial court and [Counsel] had a duty to address them.

¶17 Thomas's claims of error fail because the prosecutor's comments were well within the latitude attorneys are afforded during closing argument. Given that the prosecutor's statements were not improper, Counsel had no reason to object to them and the trial court had no grounds to intervene sua sponte.

¶18 "Like defense counsel, prosecutors have considerable latitude in their arguments to the jury, and they may discuss fully their viewpoints of the evidence and the deductions arising therefrom." *State v. Alarid*, 2022 UT App 84, ¶ 44, 514 P.3d 610 (cleaned up). But this latitude is not unlimited. "The prosecution's responsibility is that of a minister of justice and not simply that of an advocate, which includes a duty to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." *State v. Todd*, 2007 UT App 349, ¶ 17, 173 P.3d 170 (cleaned up). Accordingly, "the conduct of the prosecutor at closing argument is appropriately circumscribed by the concern for the right of a defendant to a fair and impartial trial." *Id.* (cleaned up). This means that the prosecutor should (1) "refrain from argument which would divert the jury from its duty to decide the case on the evidence," *id.* ¶ 18 (cleaned up), (2) not "call to the attention of the jurors matters they would not be justified in considering in determining their verdict," *State v. Thompson*, 2014 UT App 14, ¶ 43, 318 P.3d 1221 (cleaned up), and (3) avoid asserting "personal knowledge of the facts in issue

or express[ing] personal opinion," *State v. Parsons*, 781 P.2d 1275, 1284 (Utah 1989). As the Supreme Court stated long ago, "[W]hile [prosecutors] may strike hard blows, [they are] not at liberty to strike foul ones. It is as much [a prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935), *overruled on other grounds by Stirone v. United States*, 361 U.S. 212 (1960).

¶19 Having said all this, "a prosecutor has the duty and right to argue the case based on the total picture shown by the evidence." *State v. Houston*, 2015 UT 40, ¶ 76, 353 P.3d 55 (cleaned up). And this includes drawing "permissible deductions from the evidence and [making] assertions about what the jury may reasonably conclude from those deductions." *State v. Bakalov*, 1999 UT 45, ¶ 57, 979 P.2d 799; *see also State v. Jones*, 2015 UT 19, ¶ 56, 345 P.3d 1195 ("There is no prosecutorial misconduct when the prosecutor is merely drawing a permissible deduction from the evidence and stating [a prediction about what] the jury would find from the evidence." (cleaned up)). Moreover, the "permissibility" of merely asking "the jury to make a reasonable inference, based on common sense and deductions drawn from other evidence presented," is not "contingent" on expert testimony. *State v. Wright*, 2021 UT App 7, ¶ 86, 481 P.3d 479. Finally, while "encouraging jurors to consider matters outside the evidence is prosecutorial misconduct, the prosecutor may fully discuss with the jury reasonable inferences and deductions drawn from the evidence." *Bakalov*, 1999 UT 45, ¶ 59 (citations omitted).

¶20 And that is what the prosecutor did here. He acted well within the boundaries afforded him by drawing reasonable inferences based on photographic evidence of Dorothy's neck injuries. In closing, he described the injuries, highlighting "dark" areas and "striations" that appeared to be caused by a rope or cord. And he directly drew this reasonable inference: "These marks are there from pressure, pressure from the ligature." This

type of inference does not require expert testimony because "whether [a] mark constituted a bruise and what caused it [do] not involve obscure medical factors but [are] within the common experience of laypersons." *State v. Whitchurch*, 2024 UT App 108, ¶ 54, 554 P.3d 1166 (cleaned up), *cert. denied*, 564 P.3d 960 (Utah 2025); *see also id.* ¶ 53 ("The average person has had sufficient life experience with bruising to know that the shape of a bruise is often similar to the shape of the object that hit the body and that the shape may, nonetheless, be distorted by the angle of the blow or nature of the contact."); *In re K.C.*, 2013 UT App 201, ¶¶ 16–17, 309 P.3d 255 (noting that "expert testimony is not required when an issue is within the common experience of laypersons," such as the cause of a bruise (cleaned up)); *State v. London*, Nos. 2008AP1952–CR, 2008AP1953–CR, at ¶ 7, 2010 WL 431667 (Wis. Ct. App. Feb. 9, 2010) (per curiam) ("Expert testimony is not required on this issue because cuts and bruises are within the common experience of the jurors."). As the source of Dorothy's bruising was within the common experience of laypersons, attributing Dorothy's bruises to pressure from a ligature was a reasonable inference. And the prosecutor's statement that the marks were not caused by self-inflicted rubbing was also a reasonable inference. Accordingly, the prosecutor's comments were entirely permissible.

¶21 Moreover, the prosecutor's statements asking the jury to draw the same inference were not improper because they invited the jury to draw a reasonable inference from the evidence. The prosecutor encouraged the jurors to form their own conclusions about the origin of these marks, asking, "Where did those [marks] come from?" Then he made "assertions about what the jury may reasonably conclude from those deductions." *See Bakalov*, 1999 UT 45, ¶ 57. For the same reason that the prosecutor's inference as to the source of the bruising did not require expert testimony, his invitation for the jury to draw that inference was not problematic—it was reasonable and within the scope of the jury's purview. *See Orem City v. Jakeman*, 2025 UT App 107, ¶ 31 (noting

that the "factfinder was well-equipped to come to [a] conclusion" that a defendant's act caused an injury "based on the photographic evidence" of the resulting bruise), *petition for cert. filed*, Sep. 22, 2025 (No. 20251122).

¶22    Thus, the prosecutor did not present new facts to the jurors regarding strangulation injuries or attempt to sway them with knowledge beyond their ordinary experience. Instead, he concentrated on the photographs, pointing out specific details for the jury's attention and drawing conclusions based on widely understood facts.

¶23    Given that there was no impropriety in the prosecutor's closing statement, both Thomas's claim of ineffective assistance and his claim of plain error fail. First, to establish ineffective assistance, a defendant must show that counsel's performance was deficient and that this deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to establish either prong "defeats a claim for ineffective assistance of counsel." *State v. Cruz*, 2020 UT App 157, ¶ 17, 478 P.3d 631 (cleaned up). Because there was no basis to assert that the prosecutor engaged in misconduct, Counsel "cannot have rendered ineffective assistance by declining to object" to the prosecutor's statements in closing, *State v. Nunez*, 2021 UT App 86, ¶ 59, 498 P.3d 458, since any such objection would have failed, *see State v. Burdick*, 2014 UT App 34, ¶ 34, 320 P.3d 55 ("It is well settled that counsel's performance at trial is not deficient if counsel refrains from making futile objections, motions, or requests." (cleaned up)). Second, plain error requires "that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Popp*, 2019 UT App 173, ¶ 35, 453 P.3d 657 (cleaned up). But because "the prosecutor committed no misconduct, . . . the court had nothing to remedy," rendering this claim of error without merit. *Nunez*, 2021 UT App 86, ¶ 54. Accordingly, both issues Thomas raises on appeal fail based on a lack of any demonstrated error.

CONCLUSION

¶24    Thomas's claims of error both fail because there was nothing improper about the prosecutor's challenged statements. Affirmed.

––––––––––