**2021 UT App 109**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
GAVIN MICHAEL HAAR,
Appellant.

Opinion
No. 20200261-CA
Filed October 15, 2021

Fifth District Court, Cedar City Department
The Honorable Keith C. Barnes
No. 181500754

Gregory W. Stevens, Attorney for Appellant

Sean D. Reyes and Marian Decker, Attorneys
for Appellee

SENIOR JUDGE KATE APPLEBY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and DIANA HAGEN concurred.[1]

APPLEBY, Senior Judge:

¶1     Gavin Michael Haar appeals his convictions for murder
and child abuse relating to the death of his then-girlfriend's two-
year-old son (Victim). Haar points to two purportedly
problematic aspects of his trial, which he argues entitle him to a
new one: witness testimony offering opinions on the veracity of
Haar's multifarious stories of how Victim received his fatal
injuries, and a few sentences of the prosecutor's closing
argument. But these challenges are unpreserved, and because we

---

1. Senior Judge Kate Appleby sat by special assignment as
authorized by law. *See generally* Utah R. Jud. Admin. 11-201(7).

conclude that Haar cannot demonstrate prejudice by showing a reasonable likelihood of a different outcome even without the purportedly improper testimony and closing argument, we affirm.

BACKGROUND[2]

*The Living Circumstances*

¶2 Haar began a "sexual relationship" with Victim's mother (Mother) in April 2018. At the time, she had four children, the youngest of whom was two-year-old Victim. At first, Haar attempted to establish a positive relationship with each of Mother's children, and "treated them well in front of [her]." At some point, an off-and-on arrangement began in which Victim lived with his biological father in Washington for "a number of months," and then in Utah with his paternal aunt (Aunt) and her family. Aunt had three children, one of whom was close in age to Victim, and the two cousins regularly played together while Victim was staying at Aunt's house.

¶3 In May, shortly after Mother began dating Haar, she and Haar retrieved Victim from Washington and all three of them moved to Utah to live with Aunt because "they didn't have a place to go." Prior to that, Aunt had met Haar only once, and "really didn't know him." A few days after they had settled in at Aunt's house, Aunt began noticing that "Haar was very angry" and became "easily irritated" with Victim, sometimes screaming at him to "shut the F up." In particular, Aunt observed that on

---

2. "We recite the facts in the light most favorable to the jury's verdict, and we present conflicting evidence as necessary to understand issues raised on appeal." *State v. Black*, 2015 UT App 30, ¶ 2, 344 P.3d 644.

these occasions, Haar often would "grab [Victim] by the arm, yank him up and drag him down the hallway into his and [Mother's] room." Then Aunt would hear Victim "screaming out of nowhere, horribly," and she would attempt to intervene by "bang[ing] on the door, trying to get in the room," but she could not enter because the door was locked. Aunt also observed that Mother did not personally discipline Victim—indeed, Aunt noted that "[s]he never disciplined" "any of her kids"—and when Victim misbehaved Mother simply asked Haar, "Are you going to do anything?" According to Aunt, although Mother suggested that Haar "needed to be the one to do it," Mother also went "back and forth" and at points complained that Haar was "too aggressive" in disciplining Victim. Aunt also observed Haar "roughhousing" with Victim because Haar thought Victim was "a sissy, so he needed to be toughened up." But these interactions "always ended the same" way: with Victim "crying because he would hit his head really hard . . . from being shoved."

¶4      After approximately two weeks, Aunt asked Haar to move out but told Mother and Victim they were "welcome to stay." Nevertheless, Mother "left with [Haar] and took [Victim] with her." The trio moved into a friend's (Friend) house; Friend had known Haar for "[r]oughly five months" and had only known Mother while she and Haar were together. Friend took them in despite not wanting Haar there because "all [she] wanted to do was help [Victim]" and "they kind of were a package deal." They stayed at Friend's basement apartment for one week, during which time Friend noticed multiple bruises on Victim. Haar offered several explanations for the bruising, including that "the dog hit [Victim] and he fell over" and that Victim "fell off the couch."

¶5      On Friday of the week they stayed with Friend, Mother worked the graveyard shift at a local grocery store, where she "had just started a job," and during the day on Saturday

"everybody [was] home." On Saturday night, while Mother was again at work, Haar sent her a text message that said, "He hit his head pretty good on the floor." A few seconds later, Haar sent another message: "Got another bruise. We're gonna have to make up this boy."

¶6      On Sunday, Friend, Friend's daughter, Mother, Haar, and Victim spent five to six hours playing at a local lake. At one point, Victim "got a little tired," and Friend "stayed with him on a blanket" while he rested. Friend did not notice bruising on Victim during the trip to the lake, apart from "one little light" bruise on his face. But the next day—Monday—Friend saw Victim in the bathtub and noticed that "he was covered in bruises . . . that [were] not there 24 hours before." Friend approached Mother and asked whether she had seen the bruises, Mother responded affirmatively, and Friend "left it at that."

¶7      At some point later on Monday, Mother apparently left the house, during which time Haar sent her a series of text messages. At 5:12 p.m., he wrote, "You need to get home now," followed a few minutes later by, "Babe it's [Victim]." Then, at 5:28, Haar texted Mother, "You fucking went further th[a]n you were supposed to. Get the fuck home now. You['re] done with the truck never again. I'm fucking livid. And your son is about to get an ass beating." Mother replied, "I didn't have my phone I'm on the way. Sorry."; to which Haar retorted, "No I'm fucking pissed I said to Smith's only. You['re] never getting the truck again."

*The Night of the Murder*

¶8      Mother was scheduled to work another midnight shift on Monday night and left Victim in Haar's care. Friend noticed nothing unusual about Mother's demeanor as she prepared for work that evening, and noted that it was "just a normal night." After Mother left at around 11:45 p.m., Friend and Haar each

smoked a cigarette and drank a beer, and Friend went to bed around midnight.

¶9     Mother began her shift just after midnight, by which time it was Tuesday morning. At 12:35 a.m., Haar called Mother but she did not answer; instead she sent Haar a text message at 12:36 stating, "Can't talk, text me." A few seconds later Haar responded via text, "Get home now. Emergency [Victim] not breathing." Mother responded, "Okay." Haar then texted Mother, "Anyone ask about bruises we got the[m] four wheeling."[3] This entire text exchange occurred in less than two minutes.

¶10     At 12:39 a.m., Haar texted Mother, "I'm calling the cops," and at 12:40, he called 911. Haar gave the dispatcher his address, but when asked for his phone number, Haar responded, "That's not important right now. What's important right now is my girlfriend's son isn't breathing. We had a four-wheeler accident two days ago, and he says he's been hurting in his stomach and

---

3. This is the first of many references in the record to a narrative in which Victim allegedly sustained his injuries from an accident while he and Haar were riding a "four-wheeler." While "four-wheeler" is in some sense an ambiguous term that can mean any "vehicle with four wheels," *see Four-wheeler*, Merriam-Webster, https://www.merriam-webster.com/dictionary/four-wheeler [https://perma.cc/YSE2-HD2J], the term is also a colloquialism for an all-terrain vehicle, or ATV, *see, e.g.*, *Gantz v. Wayne County Sheriff's Office*, 513 F. App'x 478, 479 n.2 (6th Cir. 2013) ("'Four-wheeler' is a term commonly used to refer to all-terrain recreational vehicles (also known as ATVs)."). We interpret the references in the record as incorporating the latter definition. Accordingly, in this opinion we maintain the original nomenclature when quoting directly from the record, but otherwise use the term "ATV accident."

everything, but we thought he would be okay." The dispatcher told Haar she was paging an ambulance, then asked a few questions about the alleged ATV accident. Haar told the dispatcher where the accident had allegedly occurred and indicated that he and Mother did not bring Victim to a hospital because he had only "minor bumps and bruises." The dispatcher instructed Haar on how to administer cardiopulmonary resuscitation (CPR) until emergency responders arrived.

¶11 After being notified of the 911 call, two police officers quickly made their way to the scene. As the first responding officer (Officer) arrived, Haar was "running out of the house with [Victim] in his arms" and "screaming at [the officers] to save him." Officer administered CPR until paramedics arrived, but while he was doing so, Haar "kept trying to get [Officer's] attention" to tell him about the ATV accident. Haar told Officer that he had been riding an ATV with Victim when it overturned; Haar stated that he had been "thrown free" but Victim was pinned underneath the vehicle, and Haar "used super human strength" to lift it off of him. Although the situation was "fairly chaotic," Officer noticed that Victim had a "pretty extreme bruise . . . under his left eye" and "some other bruising to his face," but there were "no scrapes, no abrasions" that would have been consistent with an ATV accident. Because of these apparent inconsistencies, as well as Haar's demeanor, "red flags started going off" in Officer's head. Officer continued administering CPR until paramedics arrived.

¶12 Meanwhile, Friend's daughter woke her up at 12:55 a.m., and Friend saw "blue and red lights" shining through the window of the apartment. During the roughly fifty minutes Friend was asleep, she did not hear any noises—despite being a "light sleeper" and "shar[ing] a wall" with the bedroom that Mother, Haar, and Victim occupied together. She immediately ran outside and saw Victim "laying on the driveway,"

surrounded by police and emergency responders. By that point, Mother had also arrived.

¶13  Paramedics could not revive Victim, and he was transported to the hospital, where Haar again told the story of the alleged ATV accident to the treating physician and others as Victim was "getting . . . worked on." The emergency physician who led Victim's treatment observed "some odd bruising to [Victim's] abdomen," and that his "abdomen was distended"—meaning that it was "protruding out more than [one] would anticipate." Victim still did not have a detectable pulse at the hospital, and after forty-eight minutes of medical professionals attempting to resuscitate him, Victim was declared dead. Because Victim's death was "unanticipated," and based on the "traumatic" injuries he had sustained, the treating physician notified the Utah Office of the Medical Examiner (OME).

¶14  After Victim was pronounced dead, a detective (Detective) arrived at the hospital, and Officer expressed his concerns regarding the inconsistences he had noticed between Victim's observed injuries and the ATV accident story Haar repeatedly told. Detective examined Victim and observed "extensive bruising over his . . . body," indicating that the "trauma . . . he experienced was obviously significant." Detective approached Haar and Mother and introduced himself as the investigating detective. Haar "immediately and very aggressively and very gruffly. . . shouted, 'Why?'"

¶15  Once Haar had "calmed down," he and Mother accompanied Detective to a "quiet room" in the hospital "for family members . . . going through this type of situation." By that time, an OME field investigator (Field Investigator) had arrived, and he and Detective began questioning the couple. Haar "answered every single one of the questions," including those directed toward Mother. When Mother tried to speak, Haar would "physically hush" her and "answer for her," even

for personal questions such as her name and date of birth. Haar's initial story during the questioning was that they had gone camping the prior Thursday night and then drove off-road on Friday afternoon. Haar said he had been driving the ATV with Victim, while Mother followed in Haar's car. Haar said that during the ride, he took "a corner too sharp" and the ATV overturned, causing him to be ejected while Victim became pinned underneath the vehicle. Detective immediately thought that this explanation "seemed very improbable" because, based on his understanding of "physics," it would be highly unlikely for an adult male to be thrown from the vehicle while a much smaller child would remain "stuck to the four-wheeler and roll[] with it." Haar said Victim "didn't appear to be seriously injured" after the accident, and did not display any symptoms until Sunday, when he "indicated that his tummy hurt" and "vomited a couple of times." According to Haar, Victim "continued to vomit and be ill" on Monday, vomiting again "around midnight" "shortly after [Mother had] left for work." After cleaning Victim, Haar asked Victim if he was alright, to which Victim supposedly responded, "I okay." Haar then left Victim "on the bed watching a movie while he went outside to smoke a cigarette," and when he returned Victim was "unresponsive." Haar thought Victim was "choking on vomit," so Haar "slapped him several times on the back . . . in an attempt to clear his airway." Haar also described feeling a "distinct heartbeat" at that time.

¶16 Detective decided it would be best to conduct more formal interviews with Mother and Haar, and suspended questioning. But before leaving, he and Field Investigator explained the typical process, including that Victim's body would be transported to the OME in Salt Lake City for an autopsy. In the middle of their routine description of what would occur, Haar interjected, "We

don't want an autopsy. . . . We want [Victim] to be cremated as soon as possible."[4]

*The Investigation*

¶17   After concluding the discussion with Haar and Mother, Field Investigator examined Victim's body, observing "pronounced and numerous bruises of all shapes and sizes" on Victim's face, chin, neck, chest, and abdomen. In particular, he noted "very dark bruising on [Victim's] forehead that went down around his left eye," "a really distinct bruise on the upper lip," "linear bruising along the jaw line," numerous "small, circular bruises all over the abdomen," and "three really distinct . . . circular bruises around the back that were very consistent with finger marks." Victim's body was then transported to the OME in Salt Lake City for an autopsy.

¶18   The next day, a forensic pathologist medical examiner (Examiner) conducted an autopsy, witnessed by Detective. Examiner immediately noticed multiple bruises on Victim's face—some of which were "very large"—including on the center of his forehead, his eyebrows, his cheek just below his left eye, and his lip. Examiner opined that several of these injuries were consistent with someone grabbing Victim's mouth and obstructing his airway. For instance, Examiner noted a long bruise straddling Victim's jaw line that was "consistent with pressure applied from the finger pressing in that area." There also were numerous "petechial hemorrhages" on Victim's right and left cheeks and each eyelid, which are usually caused by "pressure buildup" and could result from several things, such as vomiting; but based on the other injuries, Examiner concluded

---

4. Field Investigator's recollection of these remarks had slightly different phrasing, but the substance was essentially the same.

that the hemorrhages likely resulted from Victim trying to breathe while someone obstructed his mouth and nose.

¶19 What was "most striking" to Examiner were the "multiple small bruises across [Victim's] abdomen and chest." These bruises were "usually discrete [resulting] from impact with round surfaces"—patterns and placement indicating that the bruises came from impacts with "knuckles or fingertips." Some of these bruises also had "overlapping" abrasions. And on Victim's back there were "three discrete bruises lined up" in a manner "consistent with a grab mark [from] three fingers applying pressure." Examiner found it "unlikely" that the abdominal bruising would have come from "innocent playing," and contrasted these with lighter bruises on Victim's hand, knees, and shins, which were more indicative of "normal play."

¶20 Examiner also discovered that "some but not all of the exterior bruises had corresponding injur[ies] on the inside" of Victim's body. There was "a bruise on the back side of his liver," which caused his liver to become "pale" from blood loss—as opposed to the "reddish brown color" of a healthy liver. The "position and orientation" of the liver bruising indicated that "blunt force trauma" had been applied that made Victim's liver "slap against" his ribs. Victim also sustained four distinct tears to his mesentery[5] and an "inch-and-a-half long" tear to his small intestine. Examiner described the tears in the mesentery and small intestine as "very unusual finding[s]," evincing a "blunt impact . . . from the front" that compressed those organs between the point of impact and the spine, causing them to

---

5. Examiner described the mesentery as a "sheet" of fat tissue "attache[d] to the large intestine and . . . small intestine." Its anatomical role is a "supporting structure for blood vessels to come out to the small and large intestine, absorb nutrients, and get those nutrients back into the blood stream for [the] body."

tear—something that would require "a lot of impact" from a "crushing type injury." According to Examiner, these types of injuries typically are found in victims of motor vehicle accidents, but he had also witnessed them in child abuse or domestic violence cases including, for instance, when an abuser had "stomped" someone. Because of the significant number of arteries and veins leading from the mesentery into the bowel, when a tear occurs there will be "bleeding into th[e] fat tissue of the mesentery itself," as well as "bleed[ing] externally into the abdomen." As a result, Examiner recovered "about 200 milliliters" of blood from Victim's abdominal cavity, which did not include additional blood that was inside the organ tissue itself. As a two-year-old, this would have comprised "about one-fourth of [Victim's] total blood volume."

¶21 In addition to the abdominal and facial injuries, there were several injuries not directly tied to the fatal blows. Inside Victim's mouth, his frenulum[6] was "torn or ripped," and he had partially bitten through his tongue. It also was apparent from other hemorrhaging on Victim's scalp that his hair had been pulled out in several places, causing "spots where there [was] no hair whatsoever." In addition, Examiner observed "a stretch tear from pulling" on Victim's genitalia, and bruising that indicated "pinching of the scrotum."

¶22 Based on the observed injuries, Examiner concluded "to a reasonable medical certainty" that Victim's death was caused by "blunt force injuries [to] the torso," and the manner of death was homicide. Examiner also ruled out an ATV accident as the cause of death based on "the distribution of the injuries, the

---

6. The frenulum, as described by Examiner, is a "little bridge of tissue" connecting the inside of the upper lip to the gums adjacent to the front teeth.

appearance of the injuries, and the time interval that was given between the time of the accident and his death."

¶23 After Detective received these conclusions from Examiner, Detective "did not believe that the four-wheeler accident had even taken place." The next day, after returning from the autopsy—two days after Victim's death—Detective interviewed Mother and Haar separately at the police station. In the midst of Mother's interview, and prior to Haar's, Haar and Mother texted each other. In relevant part, the messages were as follows:

> Mother: They're just doing their jobs.[]
>
> Haar: I won't let you gotta jail. If anything I hope I do
>
> Mother: I don't want for either of us to go. It's gonna be okay
>
> Haar: I hope so
>
> Haar: It's my fault he was bruised
>
> Mother: It was an accident. Neither of us meant for anything to happen
>
> Haar: I was to[o] mean.
>
> Mother: Stop.

¶24 In their interviews, they each maintained that Victim's injuries stemmed from an ATV accident, but aside from that core similarity Mother and Haar gave "staggeringly different" versions of what happened on the weekend before Victim died. According to Mother, they started camping on Friday night, whereas Haar stated that they spent Friday night at

Friend's house and did not leave for the camping trip until Saturday evening. Mother asserted that the ATV accident had occurred around noon on Saturday, prompting them to curtail the camping trip, and that the family went bowling Saturday evening and spent Saturday night at Friend's apartment. Haar stated that they did not leave for the camping trip until after bowling on Saturday afternoon, that they went driving off-road after dark on Saturday night, and that the accident occurred around midnight. Haar had trouble remembering the aftermath of the accident because "it all happened so fast," but he remembered Victim being pinned on his back under the ATV. According to Haar, Victim was able to "[get] up on his own" and hug Mother, and after he had stopped crying they decided to camp instead of going into town to "have him checked out." He said that it took them "an hour and a half" to decide what to do with the ATV and "make sure [Victim] was okay," and that it was 2:00 or 3:00 a.m. on Sunday morning by the time they returned to their camp with the ATV in tow, at which point they opted to sleep "under the stars on a tarp." And regarding the trip to the lake on Sunday afternoon with Friend and her daughter, Mother said that Victim "played in the sand and had fun," whereas Haar said Victim was "lethargic" and "slept for the four or five hours" they were at the lake.

¶25   There were also "vast difference[s]" between Mother's and Haar's accounts of the damage done to the ATV and what happened to it after the accident. Mother stated that the ATV "wouldn't start" but that "she didn't see any physical damage," and that they had left it at the accident site. Haar gave a more elaborate account of the damage, asserting that the front tire of the ATV had been "buckled out" and they needed to tow it with "ratchet straps" back to where they camped that night, which is where they left it. When Detective asked Haar about the location of the ATV because he would need to examine it, Haar "put his

head in his hands and put his head down," which Detective interpreted as "a sign of resignation."

¶26 Haar also was questioned about the extensive bruising on Victim's body. Haar denied knowing about any potential cause of injury other than the ATV accident and bruising that Victim would get from Haar "roughhousing" with him. When questioned about the facial bruising and the injuries to Victim's tongue, and whether he or Mother ever grabbed Victim by the face, Haar stated, "No. She would never do anything—" and then continued, "Never. She couldn't—she wouldn't hurt a fly. She was as gentle as can be." He elaborated, "I mean, she's got three other daughters that . . . come stay with us all the time on the weekends."

¶27 In another segment of the interview, Haar admitted that Mother had told him several times that he was "being a little hard" on Victim, to which Haar conceded he "probably shouldn't [have] hit him or smack[ed] his hand." Haar also admitted that he had spanked Victim with a wooden spoon on one occasion while staying at Aunt's house, and after that he wrote Victim's name on the spoon and used it as a visual aid to indicate that Victim might be spanked if he did not do as Haar told him to.

¶28 After the interviews, Detective collected Mother's and Haar's cell phones. Haar's phone was encrypted and investigators were unable to examine it, but Mother's was not and investigators generated a "full forensic download" of her phone's contents, allowing Detective to examine the aforementioned text messages between Haar and Mother.

¶29 At some point after the interviews, Haar and Mother left Utah for Washington, which Mother said was to seek "support" from her family there. In October, Haar was charged with one count of murder and two counts of child abuse, and a warrant

was issued for his arrest. They were arrested by authorities in Washington in November, and transported to Utah.[7]

¶30    Shortly after his arrest, Haar wrote "a very long and quite obviously rambling letter" from jail. In this letter, Haar for the first time alleged that Mother was the cause of Victim's bruising in the weeks before he died, as well as his fatal injuries. In particular, Haar alleged that Victim started getting bruises within "a couple weeks" of Haar and Mother taking care of him, and that Mother was the one who "always had an excuse for [the bruises]." One such instance was when Haar confronted Mother during a diaper change about a bruise on Victim, and Mother supposedly "said she had spanked him with a wooden spoon [be]cause he wasn't listening." He also described occasions when Mother supposedly "had her knee in [Victim's] stomach" during a diaper change, and kicked Victim in the stomach on the Sunday before he died. Finally, he recounted that he had called Mother when Victim first became unresponsive and she allegedly "begged [him] to say it was from the four[-]wheeler," and averred, "I ended up making up a lie [be]cause I was scared for [Mother] more th[a]n myself."

¶31    Haar wrote a second letter from jail on March 5, 2019. He began by asserting, "Everyone has it all wrong. Yes I lied, yes I have had a bad temper now and then. But I did not and never have beat [Victim]. . . . You see [Mother] is the one that did these things to [Victim]." He also reversed course from the previous letter by stating that he "[o]nly once . . . spank[ed] [Victim] with a wooden spoon," causing a "round mark on his butt." Haar also gave multiple explanations—some old and some new—for how Victim had sustained various injuries in the days before his

---

7. Mother was arrested also and charged with obstruction of justice and child abuse; she pleaded guilty to those counts and later testified against Haar at trial.

death. He described that a dog had "r[u]n over" Victim, causing a bruise below his eye; that Victim had fallen off of a rock wall at a playground, causing an injury to "the inside of his upper lip"; and that he had fallen "off the couch and smacked his head on the ground." Haar also reiterated that Mother put her knee in Victim's stomach and kicked him on Sunday, that Victim repeatedly vomited on Sunday evening and Monday, and that he cleaned the vomit off Victim and himself. He also asserted that, when he had texted Mother, "your son is about to get an ass beating" while she was away, he "actually me[a]nt [the] dog."

¶32    Haar wrote a third letter on March 6—the same day as the preliminary hearing, when Detective, Examiner, Aunt, Friend, and the emergency room physician each testified—in which he recited a confession Mother supposedly made to him while they were in Washington. According to Haar, Mother told him that she was "disgusted at [the] sight" of Victim and "tried to strangle him but [e]very time [she] felt him go limp [she] let go and he would gasp for air." She purportedly told Haar that she "used [Victim] as a punching bag" and beat Victim in the stomach because she "figured [it] wouldn't show signs or bruises [be]cause it's a soft area." Mother allegedly "kept beating him until it seemed he just couldn't cry anymore," then stopped to smoke a cigarette; by that time Haar had returned from a walk and she told him that Victim had vomited and Haar needed to clean it up while she got ready for work.

¶33    Haar also called his own mother while he was in jail; the call was recorded, and as they discussed why he was there, his mother read several text messages that Haar had sent her a few hours after leaving the hospital on the night Victim died. According to a transcript of the recorded phone call, the text exchange (in relevant part) was as follows:

> Haar: Mom, I don't want to be here anymore. I watched a two-year-old boy die last night. I feel

empty inside. What's the point of going on anymore? I love you, Mom.

Haar's mother: Call me. You must not be on Facebook. I've been going through hell. What happened to the baby?

Haar: I don't want to talk. I just want to be alone. He is dead. We watched the doctors do everything they could last night. I feel like it's my fault. I shouldn't have left him alone. I shouldn't have gotten mad when he threw up on me and I pushed him off the bed as I ran. I should have been gentle.

*The Trial*

¶34    There was a four-day jury trial in February 2020. The State presented testimony from Aunt, Friend, Officer, Detective, Field Investigator, Examiner, the emergency physician who treated Victim, and Mother. The jury also heard the recording of Haar's 911 call, several recordings from Haar's interview with Detective at the police station, the recording of Haar's call to his own mother, and the text messages between Haar and Mother, which were read into evidence.

¶35    Aunt began by describing Victim as a "goofy baby" and "a lovable little guy." She discussed some of his favorite playtime activities and food, noting in particular that he "absolutely loved yogurt," and when she "showed him [he] could add cereal to it, it blew his mind." She also recounted that Victim and her own son, who were roughly the same age, often played together, but that they were "complete opposites," with her son liking to "roughhouse" while Victim "just wanted to cuddle." In addition, Aunt testified about the short period that Haar, Mother, and Victim lived at her house.

¶36 Aunt was present at the hospital on the night of Victim's death, and in her trial testimony she described multiple explanations Haar gave for Victim's bruising, including that the ones on his mouth were from "falling at the park two days before, and that the rest of the bruises on his chest and his armpits were from [Haar] throwing him up in the air and catching him." Aunt approached Detective at the hospital—which Detective's testimony corroborated—and "was pretty adamant that there had not been a four-wheeler crash."

¶37 Friend testified about the week that Haar, Mother, and Victim lived with her, and what she had observed. She also testified that everyone was at home on both the Friday and Saturday nights, and no one had talked about a camping trip.

¶38 Officer testified about his arrival on the scene and the ensuing events, as described above. He also offered an opinion he reached in the midst of the situation that the ATV story was "not plausible," and "nothing seemed right about the story or the way [Haar] was telling it," based on Haar's demeanor and inconsistencies between Victim's injuries and typical injuries from such accidents. In particular, Officer noted that "alarms just went off immediately" because Victim had bruising but "no road rash, no scrapes, no cuts, no blood, [and] no loose skin," and Officer had never seen a vehicular accident "where there wasn't some kind of an abrasion or scrape to go along with the bruises." Officer described Haar's demeanor when he was administering CPR as "very animated, very over-the-top," and "dramatic," but at the hospital Haar was notably "calm." In contrast to Mother, who was "just quiet and calm and level" and "didn't have a lot to say," Haar was "outgoing and wanted to answer any questions that were asked." Officer concluded by saying, "The way [Haar] kept trying to get my attention while I was doing CPR has never left me. . . . I can't imagine a parent acting like that to . . . a person that's giving emergency lifesaving aid to . . . his girlfriend's son."

¶39　The emergency room physician testified about the life-saving efforts in which he and his treatment team engaged. He also described his observations of Victim's abdomen, including "some odd bruising" and abdominal distension—a condition commonly caused by internal bleeding or gas in the intestines. The physician offered his view that Victim's abdominal injuries "could be consistent" with being pinned by an overturned vehicle, but that he "would have expected the child to be in a lot more distress throughout that next day and have had some significant repercussions . . . that would have manifested themselves" before then.

¶40　Field Investigator testified about his general perceptions of Haar during the hospital interview, describing him as "jittery," seemingly "trying to anticipate and make sure that he answered [the] questions the way that he wanted them answered." Field Investigator also described Haar's vehement statements about not wanting an autopsy as "a really out of the ordinary response."

¶41　Examiner testified as an expert, providing his opinion on how Victim likely would have acted after suffering the blows to his abdomen and resulting internal injuries. Based on the four tears in Victim's mesentery, in addition to the other injuries, Examiner opined that Victim's blood loss would have been "rather rapid." And because the amount of blood exceeded 200 milliliters, "about one-fourth of [Victim's] total blood volume" as a two-year-old, Victim would have quickly gone into shock, becoming "drowsy, lethargic and [then] unresponsive soon thereafter." Examiner further opined that Victim likely would have been unresponsive within "[f]ive to ten minutes." On cross-examination, Examiner conceded that it could have taken "up to an hour" for this to occur, but it was "more likely . . . a much shorter time." Also on cross-examination, Examiner opined that, while it was possible for CPR administration to cause petechial hemorrhages in some circumstances, "[i]n this particular

instance, because [Victim was] bleeding into his abdomen and going to be in shock, . . . it's even less likely that CPR" would cause them.

¶42    Examiner was asked whether it was "medically possible" for Haar's version of events—Victim being able to utter "I okay" and sit up and watch a movie shortly before becoming unresponsive—to have occurred. Examiner responded that "none of those activities would make sense" because Victim would not have been able to converse and act normally after sustaining those injuries. Victim likely sustained "multiple blows," which would immediately "cause pain" and prompt Victim to "cry or scream"; he would not have been able to "go about normal activity," including "playing, or just sitting still and being quiet," after receiving them.

¶43    Detective testified extensively about his opinion that Haar displayed a "clear pattern of lying" based on the "many, many inconsistencies in his statements." He offered his opinion that Haar putting his head into his hands during the interview when asked about the location of the ATV was "evidence that the story was false." Detective opined that Haar's texts to his mother, as recounted in the jailhouse phone call, showed he had a "guilty mind" based on his statements of fault and remorse, as well as his admission that he acted violently toward Victim. He likewise opined that the texts between Haar and Mother on the day of their interviews with Detective "point[ed] to a guilty conscience and a belief that they were going to be held accountable for their actions in this case."

¶44    Detective also testified about the "fundamental shift[s]" in Haar's first letter from his previous narratives, including going from stating that neither he nor Mother would hurt Victim to directing toward Mother the blame for all of Victim's injuries. Detective identified another major inconsistency between the first letter and other evidence: whereas Haar's letter alleged that

Mother had "begged [him] to say it was from the four[-]wheeler" when he called her after Victim became unresponsive, in reality Mother "never answered" the call, meaning that "[t]here was never a conversation on the phone at that time between him and [Mother]."

¶45 Detective also described another inconsistency wherein Haar stated at the police station that he had spanked Victim with a spoon, then stated in the first letter that it was actually Mother who had spanked Victim with the spoon, and then shifted again in the second letter to stating that he was the one who hit Victim with the spoon. Also, when describing Haar's assertions in the second letter, Detective opined that Haar was "coming up with explanations just again and again and again" about how Victim sustained various bruises and other injuries, and that he was "starting to get his excuses mixed up with each other," to the point that "the same bruise now [had] different excuses behind it." He also offered his view that the narrative about Mother supposedly kneeing and kicking Victim in the stomach on Sunday represented Haar "trying to come up with an account to explain how this could have happened . . . while not understanding [the] timeline of how quickly . . . [Victim] would have succumbed to those injuries." And Detective offered his conclusion that Haar was the only one who could have been "in the room with [Victim] at the time the fatal injuries were delivered."

¶46 On cross-examination, defense counsel asked Detective why he did not perform an in-depth follow-up investigation on the allegations in Haar's letters, as he had done with the ATV accident narrative. Detective responded that there "was no credibility to the new information" because it "came directly from [Haar]" and no one else, and it was inconsistent with the rest of the evidence gathered by that point. In particular, he described how, by the time the third letter was received, "there

had been so many different versions of the narrative . . . that the credibility was pretty low at [that] point."

¶47    Mother rebutted the assertions made in Haar's letters, testifying that Haar "made up the lie about the four-wheeler accident." She also said she believed that Haar inflicted the injuries that caused Victim's death (although on cross-examination by defense counsel she confirmed that she was "only assuming" Haar killed Victim based on the circumstances, and had no actual knowledge that he had done it).

¶48    Once the State rested, the defense presented its case, during which Mother and Haar each testified. Haar admitted at the outset that he had been untruthful about "[p]retty much everything," including the ATV story and "certain things about the bruises." But he maintained that this was because Mother had "begged" him to lie prior to and during the 911 call. And he claimed—for the first time at trial—that the reason Mother's cell phone showed she did not answer him on the night of Victim's death was that he had two cell phones at the time, and he had called her "work phone" on one phone while simultaneously being on the line with the 911 operator on his other phone. Haar testified that he lied to "protect[]" Mother "at all costs," because if she were to be incarcerated he would lose his relationship with her children. He also repeated his claims in the letters, with some factual inconsistencies, that he had witnessed Mother's violence toward Victim on multiple occasions while they were living with Aunt and Friend. Haar closed his testimony on direct examination by stating that he "kn[e]w for a fact" that Mother had "inflicted the injuries that ultimately resulted in [Victim's] death." The defense also questioned Mother about the assertions in Haar's letters written from jail, and she denied saying or doing any of the things he alleged in the letters, and denied hurting Victim.

¶49 The final day of trial was devoted to closing arguments and jury deliberation. At the beginning of the State's closing argument, the prosecutor stated:

> You've heard testimony about little [Victim] . . . . We learned a little bit about who he is. He loved to be held, he loved to cuddle, . . . .
>
> We learned that he was very gentle. He didn't enjoy roughhousing and wrestling as much as the other boys, but would rather play with cars and color. He loved Cheerios in his yogurt. He loved playing with his cousin . . . . They played together, slept together, laughed together.

The prosecutor concluded the State's closing argument as follows:

> At two years old [Victim's] life was cut far too short. Too short for more hugs. Too short for more Cheerios and yogurt. Too short for more laughs with his cousin . . . , and this because of a man who barely knew [Victim], his mom's boyfriend who had been in [Victim's] life for a matter of weeks.
>
> . . .
>
> Enough truly is enough. Enough of the lies. Enough explanations. Enough blaming someone else for this murder. It is time for Mr. Haar to pay the price for this vicious, heinous, and senseless act. Hold Gavin Haar accountable for murdering [Victim]. Find Mr. Haar guilty. Thank you.

¶50 After hearing the defense's closing argument and the State's rebuttal, the jury went into deliberations. A little more than two hours later, it returned a verdict of guilty on the

murder count and the first child abuse count, but acquitted on the second child abuse count.

## ISSUES AND STANDARDS OF REVIEW

¶51   Haar appeals, asserting that certain testimony the State presented was improper because it "allowed [Detective and Officer] to hold themselves out essentially as experts in conducting investigations" when opining about Haar's credibility, which in turn "tainted" the evidence for the jury. He also contends that the prosecutor's closing argument improperly appealed to the passions and prejudices of the jury, and urged it to convict Haar on an improper basis. Haar acknowledges that these challenges are unpreserved, and asks that we review them through the lenses of plain error and ineffective assistance of counsel. *See State v. Johnson*, 2017 UT 76, ¶¶ 18–19, 416 P.3d 443 (noting that "failure to preserve an issue in the [district] court generally precludes a party from arguing that issue in an appellate court, absent a valid exception," and recognizing the "three distinct exceptions" of "plain error, ineffective assistance of counsel, and exceptional circumstances").

¶52   To persuade us that the district court has plainly erred, "a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the [district] court; and (iii) the error is harmful. If any one of these requirements is not met, plain error is not established." *Id.* ¶ 20 (quotation simplified). And an ineffective assistance of counsel claim "raised for the first time on appeal presents a question of law." *State v. Ring*, 2018 UT 19, ¶ 18, 424 P.3d 845 (quotation simplified). To present an issue for our review based on the constitutional ineffectiveness of a defendant's trial counsel, the defendant must show that (1) trial counsel's performance was "deficient" by falling "below an objective standard of reasonableness" and (2) this "deficient performance prejudiced the defense" by giving

rise to "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700.[8]

ANALYSIS

¶53 Although "[p]lain error and ineffective assistance of counsel are distinct concepts," they each "require the defendant to demonstrate that the [alleged] error or deficiency resulted in prejudice." *State v. Galindo*, 2017 UT App 117, ¶ 8, 402 P.3d 8. Indeed, "the prejudice analysis is the same under both a plain error and ineffective assistance of counsel framework." *Id.* (quotation simplified); *accord State v. Johnson*, 2017 UT 76, ¶ 21, 416 P.3d 443 (noting that the plain error harmfulness analysis is "equivalent to the prejudice test applied in assessing claims of ineffective assistance of counsel" (quotation simplified)). Thus,

8. The State asserts that Haar's arguments fail at the outset for inadequate briefing, giving us "reason alone to affirm." Appellate briefs "must explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal." Utah R. App. P. 24(a)(8). Our supreme court has observed that "there is no bright line between adequate and inadequate briefing," and cautioned against "lightly toss[ing] aside partially briefed but still discernable arguments." *See Heslop v. Bear River Mutual Ins. Co.*, 2017 UT 5, ¶ 50, 390 P.3d 314. Although aspects of Haar's brief could be more fully developed, his arguments are certainly "discernable" and supported by at least some citations to relevant legal authority. Thus, we decline the State's invitation to resolve the case for lack of adequate briefing.

because "plain error and ineffective assistance of counsel share a common standard of prejudice," if we determine that Haar is unable to make his showing on prejudice grounds, lack of prejudice will prove fatal to each of his claims. *See State v. Martinez*, 2021 UT App 11, ¶¶ 44–46, 480 P.3d 1103 (quotation simplified). Accordingly, we move straight to analyzing whether Haar sustained any prejudice from the transgressions he alleges.

¶54    "To succeed under either framework, [Haar] must show that there is a reasonable probability that but for the alleged errors, the result of the proceeding would have been different." *See id.* ¶ 44 (quotation simplified). Even assuming, without deciding, that trial counsel should have objected to the challenged witness testimony and the prosecutor's closing argument, or that the district court had a duty to intervene absent an objection, Haar still must show that the results of his trial likely would have been different absent these errors. This he cannot do. Therefore, we conclude that he "cannot succeed under the rubric of either plain error or ineffective assistance." *See id.* ¶ 41.

## I. Witness Testimony

¶55    Haar first asserts that it was error for the district court and trial counsel to allow the following testimony to be admitted into evidence: Detective and Officer giving opinions about the veracity of the ATV accident narrative, including Detective testifying that he interpreted Haar placing his head in his hands as a sign of resignation; Detective's testimony about the significance of assertions made in the text messages between Haar and Mother; and Detective and Mother offering their conclusions that Haar was the one who inflicted Victim's fatal injuries. And Haar asserts he was prejudiced therefrom because Detective and Officer "were allowed to hold themselves out essentially as experts in conducting investigations," which in turn "tainted" the evidence. But we agree with the State that "the

incriminating evidence [against Haar] was compelling—if not overwhelming—even without the challenged testimony."

¶56    First, even if Officer's and Detective's testimony about the veracity of the ATV accident narrative was improper, it had no conceivable effect on the verdict because, by the time of trial, Haar had admitted that the story was untrue. Prior to trial, Haar admitted in a handwritten letter to fabricating the narrative of the ATV accident. He claimed that Mother had "begged" him to say that Victim's injuries came "from the four[-]wheeler," and claimed that he "ended up making up a lie [be]cause [he] was scared for [Mother] more th[a]n [him]self." Haar maintained that position at trial, testifying that he had been untruthful about "[p]retty much everything," including the ATV story, but that he had lied at Mother's request. Given that the falsity of the ATV story was thus an undisputed issue at trial, there is no reasonable likelihood that Officer's and Detective's opinions to that effect influenced the jury's verdict.

¶57    Detective's testimony offering his conclusions about Haar's text messages similarly were not necessary for the jury to infer his guilt. The multiple inculpatory statements that Haar made in his text messages needed no contextualization: he told Mother that Victim had gotten "another bruise" and would need "make up"; he told Mother that Victim was "about to get an ass beating"; he suggested to Mother that if "[a]nyone ask[ed] about the bruises we got the[m] four wheeling"; he stated, "It's my fault he was bruised"; and he told his own mother, "I feel like it's my fault. I shouldn't have left him alone. I shouldn't have gotten mad when he threw up on me and I pushed him off the bed as I ran. I should have been gentle." These text messages speak for themselves and are plainly inculpatory. In each message, Haar was either communicating his own culpability about causing injury to Victim, expressing feelings of remorse, or both. Thus, even if Detective's commentary on the significance of the text messages had been excluded, there is no reasonable

probability that the jury would have viewed the content of the messages differently.

¶58   The final category of testimony challenged by Haar—Detective and Mother offering their conclusions that Haar was the one who inflicted the fatal injuries—had no reasonable likelihood of affecting the jury's verdict. As the State points out, this testimony was elicited on rebuttal after Haar had testified that Mother was the one who had fatally injured Victim. It would therefore hardly come as a surprise to the jury that Mother and Detective disagreed and believed that Haar was the guilty party.

¶59   And there was compelling—if not overwhelming—evidence to support the jury's verdict that Haar, not Mother, was responsible for Victim's injuries. Aunt testified that she directly observed Haar being violent with Victim, including dragging him down the hall and "roughhousing" to the point of making Victim cry from hitting his head "really hard." Both Aunt and Friend testified to noticing bruising on Victim, and how Haar always had a seemingly innocent explanation. As to Mother's behavior toward Victim, Aunt testified that she never witnessed Mother be "hands on" toward Victim—to the contrary, Mother "never disciplined" Victim, leaving that to Haar. Just hours before Victim's death, Haar texted Mother, "I'm fucking livid. And your son is about to get an ass beating." Later that night, Mother left Victim in Haar's care when she went to work. Friend noticed nothing unusual about Mother's demeanor, describing it as "just a normal night." After Friend went to bed around midnight, Haar was alone with Victim until the emergency responders arrived.

¶60   The State also presented overwhelming evidence that the fatal injuries were inflicted during the timeframe Haar was alone with Victim. Examiner testified in excruciating detail about how Victim could have sustained his injuries and how quickly he

would have succumbed to them—up to an hour, but much more likely in a matter of minutes. And the emergency room physician gave similar, albeit less specific, observations and conclusions. Examiner also described how, even if Victim had managed to remain responsive for as long as an hour, he would not have been talking or otherwise behaving normally during the time between receiving the blows and losing consciousness—a fact that contradicts all of Haar's narratives, including those he espoused at trial.

¶61     In addition, evidence of Haar's behavior in the immediate aftermath of Victim becoming unresponsive also could have allowed the jury to infer guilt—even without Officer or Detective overtly saying so. Officer described Haar as "very animated, very over-the-top," and "dramatic" when Officer responded and was administering CPR; and the mere fact that Haar repeatedly and assertively told the ATV accident story to Officer, other emergency responders, and the treatment team at the hospital speaks for itself—regardless of Officer stating that this gave him "red flags." Additionally, Haar's repeated efforts to control the narrative at the hospital—by "physically hush[ing]" Mother when Field Investigator and Detective were questioning her, answering questions for her, and demanding that the authorities not perform an autopsy because they wanted Victim "cremated as soon as possible"—all speak for themselves as well.

¶62     The State thus presented evidence that overwhelmingly supported Haar's guilt. We therefore conclude that Haar cannot demonstrate a reasonable likelihood of a different trial outcome without the challenged testimony, meaning that this challenge fails to meet either the plain error or ineffective assistance tests.

## II. Closing Argument

¶63     We likewise conclude that, even if the prosecutor's statements at closing argument should have prompted an

objection by trial counsel or intervention by the district court, Haar suffered no prejudice. The challenged statements were a minimal part of the State's closing argument and rebuttal, and the evidence itself was overwhelming.

¶64 Haar primarily points to the prosecutor's references during closing argument to Victim's affinity for yogurt and cuddling, as well as the prosecutor's utterance directing the jury to "[h]old Gavin Haar accountable for murdering [Victim]" because it was "time for Mr. Haar to pay the price for this vicious, heinous, and senseless act." Haar argues that, by making these statements, the State inappropriately diverted jurors' attention from applying the law to the facts and instead appealed to their passions, directing them to "put themselves in [V]ictim's place [and] take vengeance against" Haar. (Citing *State v. Wright*, 2013 UT App 142, ¶ 41, 304 P.3d 887.)

¶65 "Generally speaking, in argument to the jury, counsel for each side has considerable latitude and may discuss fully from their viewpoints the evidence and the inferences and deductions arising therefrom." *Wright*, 2013 UT App 142, ¶ 39 (quotation simplified). But a prosecutor's remarks during closing argument can be "improper" when they "divert[] the jury from its duty to decide the case on the evidence," *see id.* ¶¶ 38, 41 (quotation simplified), and instead "unfairly appeal[] to the sympathies, passions and prejudices of the jury," *State v. Campos*, 2013 UT App 213, ¶ 50, 309 P.3d 1160 (quotation simplified). This is because, in a criminal trial, the jury's "determination of guilt must not be the product of fear or vengeance but rather intellectually compelled after a disinterested, impartial and fair assessment of the testimony that has been presented." *State v. Todd*, 2007 UT App 349, ¶ 21, 173 P.3d 170 (quotation simplified).

¶66 Nevertheless, "if proof of [a] defendant's guilt is strong, the challenged conduct or remark will not be presumed prejudicial." *Campos*, 2013 UT App 213, ¶ 67 (quotation

simplified). Instead, "we [must] consider whether, under the circumstances of the particular case, the jury was probably influenced by those remarks." *Id.* (quotation simplified). "In determining whether the jury was probably influenced by the [prosecutor's] inappropriate comments, we consider the strength of the evidence supporting a defendant's guilt and the strength of the conflicting evidence . . . ." *Id.*; *accord Wright*, 2013 UT App 142, ¶¶ 41–42 ("In reviewing whether the jury was influenced by the prosecutor's statement, we consider the circumstances of the case as a whole." (quotation simplified)).

¶67 In this case, we need not decide whether trial counsel rendered deficient performance—or whether the district court committed plain error—in taking no action in response to the challenged statements. Even assuming that some or all of the prosecutor's statements were improper, Haar has not established prejudice.

¶68 To determine whether the purportedly improper argument prejudiced Haar, we must compare "the strength of the evidence supporting [Haar]'s guilt and the strength of the conflicting evidence" to determine whether the jury was unduly influenced to the point of prejudicing Haar. *See Campos*, 2013 UT App 213, ¶ 67. And as we have discussed, *see supra* ¶¶ 56, 58–60, the State's evidence supporting Haar's guilt was strong; the conflicting evidence, on the other hand, was weak. The only real conflicting evidence were Haar's letters and his trial testimony, which were each internally inconsistent with one another, and also inconsistent with the logical arc of the rest of the evidence presented at trial. As a result, we have no qualms concluding that the jury was not unduly influenced by the prosecutor's remarks in this case.

¶69 Furthermore, this court has previously concluded—albeit in a slightly different legal context—that a jury was not influenced by a prosecutor's improper comments when they

were made in "a single sentence during a closing argument and rebuttal that fills fifteen transcript pages of otherwise appropriate remarks." *See Wright*, 2013 UT App 142, ¶ 42. The outcome in *Wright* bolsters our conclusion here: Haar has identified only a few sentences of the prosecutor's closing argument as problematic, falling at the end of twenty-six transcript pages of otherwise appropriate closing argument and rebuttal. Thus, such "isolated statement[s]," even if they did urge the jury to convict for improper purposes, do not on their own evince a reasonable likelihood that the jury would have voted to acquit without them. *See id.* ¶¶ 42–43.

¶70   When everything is taken into consideration, "given the overwhelming evidence of [Haar's] guilt, he has not met the requirement of demonstrating that the prosecutor's comment prejudiced him." *See State v. Cuaquentzi*, 2015 UT App 311, ¶ 10, 365 P.3d 735 (quotation simplified). Because we have concluded that the jury would have voted to convict "[w]ith or without" the prosecutor's remarks, *see id.*, Haar's claim respecting the closing argument fails under either an ineffective assistance or plain error framework.[9]

---

9. Although we have concluded there was no prejudice in this case based on the strength of the evidence tending to show Haar's guilt, we nevertheless are troubled by the prosecutor's utterance directing the jury to "[h]old Gavin Haar accountable for murdering [Victim]" because it was "time for Mr. Haar to pay the price for this vicious, heinous, and senseless act." In our view, these statements run dangerously close to directing the jury to find Haar guilty based on "vengeance" rather than a "disinterested, impartial and fair assessment of the testimony that has been presented." *See State v. Todd*, 2007 UT App 349, ¶ 21, 173 P.3d 170 (quotation simplified). And while we offer no direct opinion on whether it was an obvious error or deficient

(continued…)

CONCLUSION

¶71 In this appeal, Haar has challenged his murder and child abuse convictions on two bases: arguing that witness testimony about his credibility was improperly admitted and that the prosecutor inappropriately appealed to the passions and prejudices of the jury during closing argument. Because neither of these issues were preserved, and Haar asks that we review them through the lenses of ineffective assistance of counsel and plain error, Haar is required to show that he was prejudiced by these purported transgressions. But Haar is unable to do so because, given the overwhelming evidence of his guilt, he cannot demonstrate a reasonable likelihood that the outcome of his trial would have been different even without the challenged testimony and statements at closing argument. Accordingly, we affirm his convictions.

——————

(…continued)

performance to allow such statements to be made at closing argument, we offer a word of warning to prosecutors who use tactics in closing argument that tend to "appeal to the passions of the jury" by suggesting that it should return a guilty verdict "out of vengeance or sympathy for the victim rather than based on what the facts and the law require[]." *See State v. Campos*, 2013 UT App 213, ¶ 52, 309 P.3d 1160. "Such a strategy during closing argument is a highly risky and improper rhetorical device that should be scrupulously avoided. In making such statements, counsel runs the risk that jurors will feel obligated to seek revenge for the victim." *Todd*, 2007 UT App 349, ¶ 21. We therefore caution Utah prosecutors not to employ such language in their oral advocacy before a jury.